**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIAM HOPKINS,**

                          **Plaintiff,**

          **vs.**                                              **1:20-CV-618**
                                                               **(TJM/CFH)**


**CITY OF SCHENECTADY, CITY OF**
**SCHENECTADY POLICE DEPARTMENT, CITY OF**
**SCHENECTADY POLICE OFFICER RICHARD**
**VERZONI, and CITY OF SCHENECTADY**
**POLICE OFFICER CHARLES STEVENS,**

                          **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

**DECISION & ORDER**

        Before the Court is Defendants' motion for summary judgment.  <u>See</u> dkt. # 57. The

parties have briefed the issues and the Court will decide the motion without oral argument.

**I.      BACKGROUND**

        This case arises out of an October 25, 2019 interaction between Plaintiff William

Hopkins and Defendants Richard Verzoni and Charles Stevens, who at the relevant time

were police officers in the City of Schenectady, New York.  On that date, Officers Verzoni

and Stevens responded to a domestic dispute call at the apartment that Plaintiff shared

with his girlfriend.  Defendants eventually arrested Plaintiff, and he claims that they used

excessive force to do so.  Plaintiff alleges that such conduct violated his constitutional

1

rights.  Plaintiff also claims that Defendant City of Schenectady had a municipal policy or custom that caused the violation of his constitutional rights.  His Complaint raises three claims: a claim of municipal liability against the City of Schenectady and the Schenectady Police Department; a Section 1983 excessive force claim against both officers; and a Section 1983 failure-to-intervene claim against Defendant Stevens.  See dkt. # 1.

Defendants answered the Complaint.  See dkt. # 8.  They filed the instant motion at the close of discovery.  See dkt. # 57.  Defendants argue that the Police Department, which is a subdivision of the City of Schenectady, cannot be liable for Plaintiff's claim. Defendants also contend that no evidence supports a claim that either Police Officer used more force than necessary under the circumstances, and that Plaintiff cannot show that Defendant Stevens could be liable for failing to intervene.  Even if Plaintiff could produce evidence that either Officer violated his rights, Defendants claim, Plaintiff could not show that the violation occurred pursuant to a municipal policy or custom, and the City is entitled to judgment on Plaintiff's claim.  Defendants also assert qualified immunity and dismissal of any claims for punitive judgement in this matter.  Plaintiff opposes the motion, bringing the case to its present posture.

## II.   LEGAL STANDARD

Defendants seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P.

56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### III.   ANALYSIS

Defendants seeks summary judgment on several grounds.  The Court will address each in turn.

### A.   Liability for the Schenectady Police Department

Defendants first argue that the Court should grant judgment to the City of Schenectady Police Department.  They contend that as a subdivision of the City of Schenectady, which is also a Defendant in this action, any claims against the Police

3

Department are duplicative of Plaintiff's claims agianst the City, and should be dismissed. Plaintiff responds by agreeing to withdraw any claims against the Police Department.

The parties are correct that "[a] city police department is not an independent, suable entity separate from the municipality in which the police department" exists. Krug v. County of Rennselaer, 559 F.Supp.2d 223, 247 (N.D.N.Y. 2008) (citing Orraca v. City of N.Y., 897 F.Supp. 148 (S.D.N.Y. 1995)). Since the City of Schenectady is a Defendant in this matter, the Court will grant the motion in this respect.

**B.    Excessive Force Claim**

Defendants next seek dismissal of Plaintiff's excessive force claim, which is raised against both individual Defendants. They argue that the evidence in this case would permit a reasonable juror to conclude only that Officers Verzoni and Stevens used reasonable force in arresting the Plaintiff. In relevant part, Plaintiff responds that jurors could reasonably find the application of force excessive under the circumstances, and that the motion should be denied.[1]

**i.    Excessive Force–Legal Standard**

Plaintiff's claim in this respect is that Officers Stevens and Verzoni used excessive force when they arrested him on October 25, 2019. Excessive force claims brought pursuant to the Fourth and Fourteenth Amendment "'are properly analyzed under the

---

[1]Plaintiff spends much of his brief arguing that the Defendants lacked probable cause to arrest him on the night in question. That issue would be relevant to summary judgment if Plaintiff had raised a false-arrest claim. He has not, in part because he pled guilty to at least one charge in relation to the incident. In any case, whether the officers were entitled to arrest him is not especially relevant to whether they used excessive force. As will be explained, whether the force used to effect an arrest violated a detainee's rights is a question independent of whether officers had cause to arrest the Defendant. The Court will focus on that issue.

4

Fourth Amendment's 'objective reasonableness' standard.'" Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)). Using "excessive force renders a seizure of the person unreasonable and for that reason violates the Fourth Amendment." Id. To decide whether the force was reasonable, a court should pay "'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993) (quoting Graham, 490 U.S. at 396). This standard focuses on "'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (quoting Graham, 490 U.S. at 397). "A court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." Id. at 103.

### ii.    Factual Background–Excessive Force[2]

At his deposition, Plaintiff testified that he suffers from bipolar disorder and has received Social Security Disability insurance as a result of that condition. Defendants' Statement of Material Facts ("Defendants' Statement"), dkt. # 57-10, at ¶ 4. Plaintiff admits that he offered such testimony, but denies that any evidence of records indicates the reasons why the Social Security Administration approved his claim for disability

---

[2]Defendants filed the statement of undisputed material facts with citations to the record as required by Local Rule 56.1(a). Plaintiff responded as the local rules require, citing to the record for facts which he claims are in dispute. The Court will cite to the Defendants' statement for facts which are undisputed and note any disputes at appropriate times. Defendants have also provided body cam footage from the incident, which the Court has reviewed.

insurance.  Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's

Response"), at ¶ 4.  Plaintiff further testified that he had been diagnosed with "'bi-polar

disorder with rapid, racing thoughts,'" and that "'every day, I live it.  I mean, it just comes

and goes.'" Defendants' Statement at ¶¶ 5-6.  Plaintiff denies that such statements are

evidence, absent medical records, of Plaintiff's actual diagnosis.  Plaintiff's Response at

¶¶ 5-6.  Plaintiff was not receiving treatment for his mental health condition on October 25,

2019, and was not taking any medication to address that condition.  Defendants'

Statement at ¶¶ 7-8.  Plaintiff further testified that he consumes alcohol and marijuana in

connection with his bipolar disorder.  Id. at ¶ 9.

Schenectady Police responded to a call for assistance with a domestic dispute at

Plaintiff's residence in Schenectady on October 25, 2019.  Id. at ¶ 10.  Plaintiff's girlfriend

had called police because she and the Plaintiff were arguing.  Id. at ¶ 11.  The door to

Plaintiff's apartment had a sign on it that read "TRESPASSING: Violators will be shot,

survivors will be shot again."  Id. at ¶ 13.  Plaintiff points out that pictures and videos

reveal that most of the sign was obscured by another hanging that stated "Angels Gather

Here" and featured three angel figures "dangling" from that statement.  Plaintiff's

Response at ¶ 13(a).  Plaintiff also points out that police reports on the incident made no

mention of either sign, and no one referenced the sign in any records of the incident made

on October 25, 2019.  Id. at ¶ 13(b).

The dispatcher informed the responding Police Officers that the call involved a

domestic dispute between a boyfriend and girlfriend.  Defendants' Statement at ¶ 14.  The

dispatcher reported that the male was intoxicated and throwing items and trying to "kick

out" his girlfriend.  Id.

6

Defendants Stevens and Verzoni were working the 4 p.m. to 12 a.m. shift on October 25, 2019. Id. at ¶ 15. Both were in full police uniform and drove separate marked cars. Id. at ¶ 15. The two Officers responded to the call from Plaintiff's residence. Id. at ¶ 16. Plaintiff had no previous interactions with either officer. Id. at ¶ 17. Plaintiff's girlfriend let both officers into the residence on October 25, 2019. Id. at ¶ 18. Defendants claim that when they arrived at the residence they noticed Plaintiff moving items onto the back porch of the residence. Id. at ¶ 19. Plaintiff contends that he told officers that the items he was moving onto the back porch included both his property and his girlfriends' property. Plaintiff's Response at ¶ 19(a). Plaintiff's girlfriend stated that Plaintiff was "'throwing all my stuff in the back yard'" and was "'bonkers on me.'" Defendants' Statement at ¶¶ 20-21. She further told officers that Plaintiff had thrown "'things around and shit'," and was "'crazy.'" Id. at ¶¶ 23-24. She told the officers that Plaintiff had gone "'to the casino and had a few too many drinks, and when he does that he gets really crazy.'" Id. at ¶ 25. On October 25, 2019, Plaintiff's girlfriend told police, Plaintiff had "'just started throwing everything around'" and "'went bonkers throwing my stuff out.'" Id. at ¶ 27. Plaintiff's girlfriend also claimed that Plaintiff had knocked over a couch, table, and lamp. Id. at ¶ 29. The parties dispute whether Plaintiff "threw" the couch or simply picked it up. Compare Defendants' Statement at ¶ 30 and Plaintiff's Response at ¶ 30. Plaintiff's girlfriend further stated that "'I want my stuff back in here.'" Defendants' Statement at ¶ 28.

The parties dispute the nature of Plaintiff's girlfriend's responses to questions from Officer Stevens about whether she felt safe in the apartment with Plaintiff. Defendants claim that she responded to the question of whether she felt safe with "I don't know." Id. at ¶ 33. Plaintiff insists that Defendants "conveniently left out" her "full response" to

queries from Stevens about her safety.  Plaintiff's Response at ¶ 33(a).  When Stevens initially asked her if she felt safe, Plaintiff's girlfriend responded "'he is not going to hurt me . . he just needs to go to bed.'"  Id.  Asked a second time, she responded, "'I do not know. I am not leaving . . . he needs to sleep it off.'"  Id.  She did not accept Stevens' offers to take her someplace else.  Id.  Plaintiff further contends that Stevens told him that Plaintiff's girlfriend told Stevens that "'she did not think [plaintiff was] going to hurt her but she did not not want to leave.'"  Id. at ¶ 33(b).

Plaintiff testified that he had been drinking on October 25, 2019.  Defendants' Statement at ¶ 34.  He drank "'way too much . . . I was having a bad day and that's –that how it happened with bipolar.'"  Id.  He was intoxicated when officers arrived at his home that night.  Id. at ¶ 36.  He had also consumed marijuana on October 25.  Id.  at ¶ 37. Though Plaintiff was "'inebriated'" he testified that he had a "'crystal'" clear memory of his interaction with the Defendants that night.  Id. at ¶ 35.

The parties dispute whether Plaintiff was "belligerent" when Defendants arrived at his home on October 25, 2019.  Id. at ¶ 38.  Plaintiff contends that he complied with Officer Steven's initial direction to remain in the kitchen, and points to Defendants' body cam videos to support this contention.  Plaintiff's Response at ¶ 38(a).  Defendants claim that Plaintiff told Defendants to "'do whatever they wanted to do.  They could arrest me if they would like.'" Defendants' Statement at ¶ 39.  Plaintiff, citing to body cam footage of the incident, points out that the statement came after an interchange between Plaintiff and Defendants concerning the property that Plaintiff had moved to the back porch.  Plaintiff's Response at ¶ 39.  Plaintiff had refused Stevens' instruction to move the property back into the residence and go to bed.  Id. at ¶ 39(d).  Plaintiff contends that his refusal of that

command "increased the tensions between plaintiff and defendant Stevens," leading

Plaintiff to ask, "'do you want to arrest me?  Do you want to attack me?  Then go ahead.'"

Id. at ¶ 39(f).

The incident that is the ultimate subject of this lawsuit grew out of a dispute

surrounding the property that Plaintiff had placed on the back porch.  Plaintiff had moved

an electric fireplace to that location.  Defendants' Statement at ¶ 41.  The parties agree

that Stevens asked Plaintiff to bring Plaintiff's girlfriend's property back into the home, and

that Plaintiff refused.  Id. at ¶ 44.  The parties disagree about whether Plaintiff broke a

picture frame that belonged to his girlfriend, and about whether Plaintiff's girlfriend told

Stevens that Plaintiff had broken the item.  Compare Defendants' Statement at 43 and

Plaintiff's Response at ¶ 43.

As the situation progressed, Defendant Stevens put on tactical gloves.  Defendants'

Statement at ¶ 45.  In response, Plaintiff put on a pair of work gloves.[3]  Id.  Defendants

contend that Plaintiff responded to Stevens' actions by stating "Oh, you've got gloves.  I

have gloves too.  What's the big deal?  If you want to arrest me–' They could have

arrested me.  I would have went willingly.'" Defendants' Statement at ¶ 46.  Plaintiff points

out that this quotation comes from Plaintiff's deposition, and that body cam videos from

the night in question do not contain that statement.  Plaintiff's Response at ¶ 46.  Plaintiff

contends that his deposition testimony contains an explanation of why he put the gloves

on, not what he said.  Id.  Plaintiff admits, however, that he put on the gloves "because he

_____

[3]Defendants' statement describes these gloves as "garden/construction gloves."
Defendants' Statement at ¶ 45.  The Court uses a more generic term.  From the video of
the incident observed by the Court, the gloves appear to be beige leather work gloves of
some sort.

'felt intimidated, threatened, and to [him] it was a joke . . . You've got gloves.  I got gloves.

Big deal.'"  Defendants' Statement at ¶ 47.  Plaintiff was in the kitchen area of the

residence at the time he put on the gloves.  Id. ¶ 48.  He moved from that area at some

point after putting them on.  Plaintiff's Response at ¶ 48.

Officer Stevens eventually asked Plaintiff's girlfriend to go out onto the porch to

determine whether Plaintiff had broken any items that belonged to her.  Defendants'

Statement at ¶ 49.  Plaintiff contends that his girlfriend did not point to any of her

possessions that Plaintiff had damaged.  Plaintiff's Response at ¶¶ 49(a)-(b).  Citing body

cam video, Plaintiff contends that, as Defendant Stevens led Plaintiff's girlfriend to the

porch, he told Plaintiff that "'If one thing is broken, even a picture frame, [he would] lock

him up.'"  Id. at ¶ 49(e).  He alleges that Defendants arrested him before his girlfriend had

even finished examining the items on the porch.  Id. at ¶ 49(f).

While Plaintiff's girlfriend went to the porch, Plaintiff left the kitchen and moved into

a hallway that led to his bedroom.  Defendants' Statement at ¶ 50.  Defendants testified

that neither of them had a complete knowledge of the layout of the residence, and that

they did not know whether Plaintiff had any firearms in his bedroom.  Id. at ¶¶ 52-53.

Plaintiff points out that both body cam recordings show that Officer Stevens asked

Plaintiff's girlfriend whether Plaintiff had any weapons when he entered the apartment,

and that she responded, "no."  Plaintiff's Response at ¶ 52(a).  Plaintiff testified that he

went to his bedroom intending to put on a shirt.  Id. at ¶ 54(a).

At some point when Defendant moved towards his bedroom, Defendant Stevens

told Defendant Verzoni, "let's detain him."  Compare Defendants' Statement at ¶ 55 with

Plaintiff's Response at ¶ 55.  Defendants claim that Stevens decided to arrest Plaintiff

when he went "into" his bedroom.  Defendants' Statement at ¶ 55.  Plaintiff insists that

video evidence demonstrates that Plaintiff was simply on the "threshold" of the bedroom

when Stevens told Verzoni that they should detain Plaintiff.  Plaintiff's Response at ¶

55(a).  Defendants claim that they detained Plaintiff for their safety and the safety of

Plaintiff's girlfriend, as well as Plaintiff's "intoxication and unpredictable state."

Defendants' Statement at ¶ 56-58.  Plaintiff disputes these claims.  Plaintiff's Response at

¶¶ 56-58.

　　　Defendant Stevens told Plaintiff to "come here."  Defendants' Statement at ¶ 59;

Plaintiff's Response at ¶ 59.  Plaintiff was in the hallway, which led to a bathroom,

bedroom, and closet.  Defendants' Statement at ¶ 60; Plaintiff's Response at ¶ 60.  The

parties dispute whether Plaintiff responded to the command to "come here" willingly or

assumed a combatant and resistant stance, bracing his arms and hands on the hallway

entrance.  Defendants' Statement at ¶ 61; Plaintiff's Response at ¶ 61.  Plaintiff was in the

hallway when Stevens reached out to take him into custody.  Id. at ¶ 62.  The parties

dispute whether Stevens told Plaintiff he was being detained before Stevens grabbed

Plaintiff.  Compare Defendants' Statement at ¶ 63 and Plaintiff's Response at ¶ 63.

　　　The parties disagree about what happened as Defendant Stevens attempted to

place Plaintiff in custody.  Compare Plaintiffs' Statement at ¶¶ 64-72 and Plaintiff's

Response at ¶¶ 64-72.  The parties agree, however, that a struggle ensued, and that both

Defendants became involved in attempting to gain control over the Plaintiff.  See id.  The

parties also agree that neither officer used a taser on Plaintiff.  Defendants' Statement at ¶

73.  Citing to video evidence, Plaintiff denies Defendants' claims that he "tensed" his body

before Stevens attempted to handcuff him.  Plaintiff's Response at ¶ 65.  He denies that

he "charged" Stevens.  Id. at ¶ 66.  He denies that he attempted to flee to the bedroom.
Id. at ¶ 67.  He denies that Stevens used a leg sweep to take him to the ground, but
instead appears to claim that Stevens and Verzoni "slammed" him to the ground.  Id. at ¶
68.  He denies that he resisted being handcuffed, or that he kicked out at Defendant.  Id.
at ¶¶ 70-71.  Instead, he alleges that Verzoni was on top of him, and "manipulated
[Plaintiff's] leg so hard it snapped and severely injured his knee."  Id. at ¶ 71(b).  He also
denies that he attempted to put his hands under his body while lying facedown in order to
avoid handcuffing.  Id. at ¶ 72.

After the altercation ended, Defendants charged Plaintiff with Assault (2d),
Resisting Arrest, and disorderly conduct.  Defendants' Statement at ¶ 99.  Plaintiff pled
guilty to disorderly conduct and paid a fine.  Id. at 102.

### iii.    Legal Analysis–Excessive Force

Defendants seek summary judgment on Plaintiff's excessive force claim against
Defendants Stevens and Verzoni.  They argue that their use of force was objectively
reasonable under the circumstances.  Defendants point out that over the course of the
encounter, Plaintiff became "aggressive, combative, and threatening," and that use of
force was required under circumstances where officers had been called to a domestic
dispute and encountered a belligerent person who seemed capable of endangering them
and his domestic partner.  Defendants point to several factors that justify their use of
force:

   a.    they were responding to a call regarding a domestic dispute involving an
         intoxicated male throwing items in the yard and attempting to kick his
         girlfriend;
   b.    a sign on the door to the apartment warned that trespassers would be shot;
   c.    Plaintiff's girlfriend had warned them that Plaintiff had been acting "crazy,"

12

and "bonkers";

d.     Plaintiff was drunk;

e.     Plaintiff had put on work gloves when he saw Defendant Stevens put on tactical gloves;

f.     neither officer knew the layout of the home;

g.     neither officer knew whether weapons were in the home or in the bedroom;

h.     Plaintiff entered the bedroom shortly before his arrest;

i.     Plaintiff resisted arrest;

j.     Plaintiff bit Officer Verzoni during the arrest; and

k.     evidence indicates that Plaintiff's girlfriend told him to "stop" during the arrest.

Defendants contend that these facts are undisputed and that, under the circumstances, a reasonable police officer "would have concluded that an 'inebriated' Plaintiff posed a danger to the Officers," Plaintiff's girlfriend, "or himself and that using force to place a resisting Plaintiff under arrest was reasonable to preserve his safety and the safety of those around him."

The Court agrees with the Defendants that no reasonable police officer under the circumstances would fail to conclude that force was necessary to take Plaintiff into custody.  The question here, however, is not simply whether some force was necessary to take Plaintiff into custody, but whether the force that Defendants used was excessive.  As Courts have explained, "'[t]he fact that a person whom a police officer attempts to arrest resists . . . no doubt justifies the officer's use of some degree of force, but it does give the officer license to use force without limit.'"  Brown, 798 F.3d at 103 (quoting Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000)).  The question is whether the force used, however necessary, was excessive.

Having reviewed all of the deposition testimony, declarations, and record evidence, as well as the body cam footage recorded by the Defendant Officers, the Court concludes that a reasonable juror could conclude that the force used was excessive.  Plaintiff's

testimony, credited by a juror, would lead to the conclusion that, after he stopped resisting, Verzoni and Stevens continued to apply force, injuring him.  The testimony from the body cams is equivocal.  Defendant Stevens' body camera did not film for most of the struggle, and Defendant Verzoni's camera fell to the floor and recorded images that are difficult to decipher.  The videos show Plaintiff resisting, but Defendant Verzoni's camera also appears to record Verzoni attempting to pull Stevens back from Plaintiff at the beginning of the encounter, perhaps indicating that Plaintiff's resistance was not as ferocious as Defendants' claim.  As in most cases like this one, the facts of the encounter are difficult to work out and could be interpreted in a variety of ways.  A jury must resolve this question. Defendants' motion will be denied in this respect.

### C.    Failure to Intervene–Defendant Stevens

Defendants next argue that the Court should grant judgment on Plaintiff's failure to intervene claim, raised solely against Defendant Stevens.  "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it."  Figueroa v. Mazza, 825 F.3d 89, 106 (2d Cir. 2016).  Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality."  Id. (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)).  "An officer who fails to intercede in the use of excessive force . . . is liable for the preventable harm caused by the actions of other officers."  Terebessi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014).  "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'"  Id. at 244 (quoting Anderson v. Banen, 17 F.3d 552, 557

(2d Cir. 1994)).  An underlying constitutional violation is a precondition of a failure-to-intervene claim.  See O'Neill, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.").

Defendants argue that Stevens did not have a reasonable opportunity to prevent any excessive force that Verzoni allegedly used.  The encounter between the three men was fast-paced, not leaving any time for Stevens to intervene.  Plaintiff has not offered any evidence to demonstrate what Stevens observed Verzoni doing, or what opportunity he had to intervene.  Plaintiff has offered only his inconsistent statements, Defendants claim, to support his failure-to-intervene claim.  Plaintiff counters that evidence exists to support his claim.  He points out that a use-of-force report indicates that Stevens prevented Verzoni from using a taser, indicating he had time to intervene, and argues that Stevens also could have intervened when Verzoni wrenched Plaintiff's leg.

The Court will deny the motion in this respect as well.  The evidence in the case indicates that, at least at some point during the scuffle between Plaintiff and Defendants, Stevens stepped away while Verzoni was on top Plaintiff.  Plaintiff claims that he suffered his most severe injuries when Verzoni was in this position, and a reasonable juror could conclude that Verzoni used excessive force at that moment, and that Stevens had an opportunity to intervene to prevent Plaintiff's injuries.  The Court does not rely solely on Plaintiff's testimony for this conclusion.  While the body cam footage is a jumble, in viewing the footage, the Court concludes that a reasonable juror could find that Verzoni's camera, fallen to the ground, recorded Stevens turning his back and walking away while Verzoni was on top of the Plaintiff.  A jury must determine what happened, and whether

15

any Defendant was at fault for what happened.

     **D.**    **Qualified Immunity**

     The individual Defendants next assert that, if any violation occurred, qualified immunity protects them from liability for that violation. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by the prior case law, without resolving the more difficult question whether the purported right exists at all." Id. "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). As such, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" Id. (quoting al-Kidd, 563 U.S. at 741). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "To determine whether a right is clearly established," a court will "'generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation.'" Vasquez v. Maloney, 990 F.3d 232, 238 (2d Cir. 2021) (quoting Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2015)). This inquiry should look at the "'the specific context of the case,'" an examination "'especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" Id. (quoting Mullenix v. Luna, 577 U.S. 7, 12

(2015)).  A reviewing court need not identify "'a case directly on point . . . but existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting al-Kidd, 563 U.S. at 741).  "[T]here must be 'a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment' . . . such that the unlawfulness of the defendant officer's conduct would 'follow immediately.'" Id. (quoting, in turn, White v. Pauly, 137 S.Ct. 548, 552 (2017), and Wesby, 138 S.Ct. 577, 590) (internal citations omitted)).

Defendants argue that, under the circumstances, they had two options: 1) arrest Plaintiff in relation to the domestic dispute on October 25, 2019, or 2) "reach some type of resolution (i.e., Plaintiff brought [his girlfriend's] belongings back into the house or have [the girlfriend] spend the night elsewhere while Plaintiff 'sobered up.')."  Because Plaintiff's girlfriend did not want to leave and Plaintiff refused officers' directions to return his girlfriend's things to the home, Defendants had no choice but to detain the Plaintiff.  As such, Defendants claims, "the use of force by Officers Stevens and Verzoni in" arresting Plaintiff "was reasonable in light of Plaintiff's combative actions and refusal to follow verbal commands, and did not violate any clearly established law[.]"  Defendants further contend that the amount of force they used was reasonable under the circumstances, and not a violation of any clearly established law.

Defendants position again appears to be that they were entitled to use force because Plaintiff resisted arrest, and that they are thus entitled to qualified immunity.  The inquiry here, however, is not whether Defendants' violated Plaintiff's constitutional rights, but whether the right they allegedly violated was a clearly established one on October 25, 2019.  Making all factual inferences in Plaintiff's favor, the Court concludes that a

17

reasonable juror could find that Defendants used excessive force in making Plaintiff's arrest.  That juror could find that, after Defendants subdued the Plaintiff, at least one Defendant continued to use force, twisting Plaintiff's knees and arms in a fashion that caused extreme pain and injury.  Such a juror could also find that the other Defendant stood by and watched while the officer used that excessive force.  Clearly established law in this circuit establishes that using more force than is necessary, even against a resisting subject, can amount to an unconstitutional use of force.  See, e.g., Brown, 798 F.3d at 103.  The Court will deny the motion in this respect as well.  As explained, liability for failure to intervene in the face of such a violation is also clearly established.

### E.    Municipal Liability

Defendants next argue that Plaintiff has not produced evidence to support his claim against the remaining municipal defendant, the City of Schenectady.  Municipal liability is limited under Section 1983 by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of County Commr's v. Brown, 520 U.S. 397, 403 (1997).  "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 142 (2d Cir. 1999) (quoting Monell, 436 U.S. at 694).

Defendants contend that Plaintiff has not produced any admissible evidence to support a claim that his rights were violated as a result of a municipal policy or custom.  In

arguing that a municipal policy or custom violated his rights, Plaintiff points to the testimony of Schenectady Police Chief Eric Clifford.  Clifford testified that Stevens and Verzoni followed the Department Use of Force Policy as directed.  Such testimony, Plaintiff claims, "provides clear evidence, well beyond a mere inference, that the Use of Force Policy was the moving force" that caused Plaintiff to suffer from excessive force in violation of the Forth Amendment.  "Using his ample experience, [Clifford] observed defendants Stevens and Verzoni in full compliance with the Use of Force Policy, despite the clear evidence that in so complying they violated plaintiff's constitutional rights and caused serious physical injury to him in the process."

The Court rejects this argument.  Plaintiff does not point to any particular deficiencies in the use-of-force policy.  Instead, Plaintiff argues that, since the municipality had a policy to prevent excessive force in place and evidence exists that Defendants used excessive force, then the policy must condone excessive force.  Plaintiff misunderstands Clifford's assessment of Defendants' use of force.  Clifford concludes that Defendants did not use excessive force, but instead followed a policy designed to prevent the use of excessive force.  He does not agree with the Plaintiff's conclusion that, by following the policy, Defendants used excessive force.  Plaintiff has failed in his duty to identify specific failures in the policy or specific examples of a municipal custom of condoning excessive force.  Without such evidence, Plaintiff cannot maintain a <u>Monell</u> claim.  The Court will grant the motion in this respect.

### F.   Punitive Damages

Finally, Defendants seek dismissal of any claims for punitive damages against the

individual defendants and the municipal defendants.[4]  In a claim alleging a violation of a

plaintiff's federal constitutional rights, punitive damages may be recovered "'when the

defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others.'"  Lee v.

Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting Smith v. Wade, 461 U.S. 30, 56

(1983).  "To be entitled to an award of punitive damages, a claimant must show a 'positive

element of conscious wrongdoing.'"  New Windsor Volunteer Ambulance Corps., Inc. v.

Meyers, 442 F.3d 101, 121 (2d Cir. 2006) (quoting Kolstad v. American Dental Ass'n, 527

U.S. 526, 538 (1999)).  Still, for a jury to consider punitive damages, "[t]he plaintiff['s]

evidence need only be enough 'to permit the factfinder to *infer* that the responsible official

was motived by malice or evil intent or that he acted with reckless or callous indifference.'"

Cameron v. City of New York, 598 F.3d 50, 69 (2d Cir. 2010) (quoting New Windsor

Volunteer Ambulance Corps., 442 F.3d at 122)) (emphasis in original).

The Court will deny the motion in this respect as well.  The evidence here is

sufficient for a reasonable juror to conclude that Defendants' conduct in using force on the

Plaintiff was motivated by malice or evil intent, or acted with reckless or callous

indifference.  Making all inferences in Plaintiff's favor, the Court finds that a reasonable

juror could conclude that Verzoni and Stevens used excessive force against Defendant

out of a desire to punish him for his obstreperous conduct or a desire to injure him.  The

Court finds several pieces of evidence relevant to this finding.  First, if jurors believed that

---

[4]Plaintiff concedes that he cannot obtain punitive damages against the municipal
defendants, and the Court would grant the motion in that respect if any claims against the
municipalities remained.  In the interest of clarity, the Court will find that any claims for
punitive damages against the municipal defendants are dismissed.

Verzoni deliberately injured Plaintiff's leg after obtaining control over his person, such jurors could reasonably conclude that his continued use of force was motivated by at minimum a reckless indifference to Plaintiff's rights.  Second, the Court has examined the body camera footage, which includes language a reasonable juror could use to find that the officers acted out of malice towards the Plaintiff, rather than out of an attempt to achieve law enforcement aims.  Officer Verzoni's camera, for instance, records one of the officers responding to Plaintiff's complaint that "you hurt me for no reason" by saying "Well don't resist arrest then."  See Exh. 57-C-1 at ca. 12:25.  The Court also notes that Officer Stevens' body cam stopped filming during the incident and then began to function perfectly after the incident ended.  See Exh. 57-B at ca. 9:02-9:37.  While there may be an innocent explanation for such an absence of video, a reasonable juror might conclude that Officer Stevens recognized his conduct as improper and tried to prevent filming of it.[5]

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment, dkt. # 57, is hereby **GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** with respect to Plaintiff's claims against the City of Schenectady Police Department and the City of Schenectady, and with respect to any claims for punitive damages against those Defendants.  Such claims for punitive damages are dismissed with prejudice even if the Court of Appeals concludes that the Court erred in dismissing the Section 1983 claims against those Defendants.  The motion is **DENIED** in all other respects.  The Clerk of

_____

[5]Similarly, the Court observed that the Defendants frequently shut the sound recording off on their cameras after the incident.  The Court makes no finding as to the reason for such pauses, but a reasonable juror could conclude that the officers acted as if they wanted to avoid creating evidence of those conversations.

Court may terminate the City of Schenectady and the City of Schenectady Police

Department from the action.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

**Dated:** March 2, 2023